2026 IL App (1st) 200462-C

SIXTH DIVISION
January 23, 2026

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 91 CR 22152 |
| | ) | No. 91 CR 22460 |
| GEORGE ANDERSON, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | William H. Hooks, |
| | ) | Judge, presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justice Hyman concurred in the judgment and opinion.
Justice Lavin dissented, with opinion.

**OPINION**

¶ 1    Defendant-appellant George Anderson submitted a claim to the Illinois Torture Inquiry and

Relief Commission (TIRC) under the Illinois Torture Inquiry and Relief Commission Act (Act)

(775 ILCS 40/1 *et seq.* (West 2018)), alleging that his convictions in two underlying cases

resulted from his torture by Chicago police in August 1991, over the course of 30 hours in

police custody. He alleged that the two inculpatory statements he signed were coerced, and he sought suppression of those statements and new trials.

¶ 2    The TIRC found sufficient evidence of torture to refer the matter to the circuit court for judicial review. The trial court conducted an evidentiary hearing over the course of four years, at which it heard testimony from numerous witnesses and considered voluminous "pattern and practice" evidence of prior allegations against the detectives who interrogated defendant. In its posthearing decision, the trial court credited the accused detectives, determined that none of the pattern and practice evidence was relevant, and found that defendant fabricated his claims of police torture. The court thus denied defendant any relief.

¶ 3    This court issued an opinion in March 2023 (*People v. Anderson*, 2023 IL App (1st) 200462), in which we reversed the trial court judgment, after applying the burden-shifting inquiry described for evidentiary hearings under the Act in *People v. Wilson*, 2019 IL App (1st) 181486, *overruled by People v. Fair*, 2024 IL 128373). Pursuant to *Wilson*, we found that defendant met his initial burden to show that the result of the suppression hearing would likely have been different in light of the new pattern and practice evidence, after which the burden shifted to the State to prove that the statements were voluntary. In concluding that the State did not meet that burden, we found that the trial court's factual findings in favor of the State were against the manifest weight of the evidence. We thus reversed and remanded for new trials without use of the inculpatory statements.

¶ 4    In March 2024, our supreme court issued a supervisory order directing us to vacate our prior judgment and to reconsider this matter in light of *Fair*, 2024 IL 128373, which rejected *Wilson*'s use of the burden-shifting inquiry in an evidentiary hearing under the Act. *Id.* ¶ 79. *Fair* clarified that the circuit court is to determine "whether a petitioner has shown by a

preponderance of the evidence that (1) torture occurred and (2) resulted in a confession that was (3) used to obtain a conviction" and that the "manifestly erroneous" standard of review applies to its decision. *Id.* ¶¶ 79-80. We subsequently vacated our March 2023 judgment and reconsidered this matter in light of *Fair.* In June 2024, we issued an opinion concluding that although the trial court identified the correct inquiry regarding defendant's burden of proof, the trial court's decision to deny relief was manifestly erroneous. Accordingly, we reversed and remanded for new trials, at which defendant's inculpatory statements will be excluded. The June 2024 opinion further specified that a different judge (or judges) should preside over subsequent trial proceedings.

¶ 5        In November 2025, our supreme court issued a supervisory order directing us to vacate the portion of our June 2024 opinion directing that the case be assigned to a new judge on remand. Our supreme court ordered us to reconsider that directive in light of *People v. Class*, 2025 IL 129695. Having done so, we do not find sufficient basis to remand *sua sponte* to a different trial judge.

¶ 6                                    I. BACKGROUND

¶ 7                                A. The Underlying Crimes

¶ 8        This appeal concerns two separate cases, case No. 91 CR 22152 (the Miles case) and case No. 91 CR 22460 (the Miggins case), which arose from separate shootings in 1991.

¶ 9        In June 1991, 14-year-old Kathryn Miles was killed, and three others were wounded in a shooting. Defendant (along with codefendant Jerome Johnson) was charged in the Miles case with counts of first degree murder and other offenses.

¶ 10       In August 1991, 11-year-old Jeremiah Miggins was killed by a stray bullet during a shootout between rival gang members. Two men, Anthony Wilson and Steven Crosby, suffered

gunshot wounds in that incident. Defendant, Johnson, and Michael Sutton were charged with murder, attempted murder, and aggravated battery with a firearm in the Miggins case.[1]

¶ 11                              B. Defendant's Inculpatory Statements

¶ 12        On August 21, 1991, defendant was arrested by Chicago police and brought to the Area 3 station, where he was interrogated regarding the Miggins shooting. At 7:45 a.m. on August 22, 1991, defendant signed a statement in the presence of Detective Michael Kill and an assistant state's attorney (ASA), Joseph Brent. In that statement, defendant admitted that he drove Johnson to and from the scene of the shooting.

¶ 13        Other detectives interrogated defendant regarding the Miles shooting. In the evening of August 22 (after being in police custody for over 30 hours), defendant signed a separate statement regarding Miles's shooting that was handwritten by another assistant state's attorney, Brian Grossman.

¶ 14                              C. Motion to Suppress Hearing

¶ 15        Defendant moved to suppress his written statements in both the Miles and Miggins cases, on the ground that he was tortured by police. On January 24, 1994, the trial court (Honorable Joseph Urso) held a suppression hearing.

¶ 16                              1. Defendant's Suppression Hearing Testimony

¶ 17        Defendant testified that on the afternoon of August 21, 1991, he and Sutton were pulled over by police. In the late evening, he was taken to 39th Place and California Avenue, where he was brought to a room and handcuffed by his left hand to a wall. Kill attempted to question him and "ignored" his request for an attorney. Kill left after defendant refused to answer his

---

[1]Johnson was a codefendant in both the Miles and Miggins cases. Johnson has similarly alleged that detectives at Area 3 interrogated and beat him until he signed confessions in both cases.

questions. About an hour later, Kill and another officer returned and asked if he was "ready to talk." Defendant again requested an attorney. Kill then "kicked the handcuffs that was on my left hand to the wall," which was painful. Defendant also testified that the other officer (whom he did not name) used his hands to hit defendant twice in the face. Kill came back alone after 45 minutes and asked if he was "ready to talk." Defendant repeated that he wanted an attorney, and Kill left again.

¶ 18    Kill returned with a state's attorney, later identified as Brent. Defendant said he wanted an attorney, but Brent "didn't say anything." Defendant refused to answer their questions and was again left handcuffed to the wall. When Kill and Brent returned and urged defendant to "tell them what happened" in the Miggins shooting, defendant still did not talk, so he was left alone again. When they returned yet again, defendant answered their questions. At that point, Kill and Brent told him they would speak to Johnson and return.

¶ 19    Kill later took defendant to another room, where Brent questioned him and wrote out a statement. Defendant was shown the statement, but he could not read it because Kill was "moving the pages" too quickly. Kill told defendant where to sign the document, but the statement was not read to him before he signed it. Defendant had not slept or eaten from his arrest to when he signed the Miggins statement.

¶ 20    After he signed the Miggins statement, he was taken to a new room with lockers, where he was left handcuffed to the radiator. Around two hours later, two different detectives (later identified as James O'Brien and Joseph Stehlik) asked him about a separate incident. Defendant said he wanted an attorney, but they did not respond. When defendant refused to

answer questions, he was taken back to the locker room, where they handcuffed his hands above his head.[2] He was left in that room for about two hours.

¶ 21 When O'Brien and Stelick returned and asked him about the Miles shooting, defendant said he did not know what they were talking about. O'Brien slapped defendant in the face. Stehlik brought out a "rubber hose or pipe." O'Brien placed a book on defendant's left side, then used the pipe to hit him through the book five or six times. They left him "hanging" there.

¶ 22 About an hour later, he was taken to another room, where he was cuffed to a radiator. The room became very cold. O'Brien and Stehlik returned a number of times, but defendant declined to speak with them.

¶ 23 Stehlik later returned to the room with an ASA (later identified as Grossman). When defendant he said he wanted a lawyer, Grossman did not respond, and defendant was left alone in the room. Defendant recalled that Stehlik and Grossman repeatedly asked if he was ready to talk but left him in the room (still handcuffed) when he declined.

¶ 24 Eventually, Stehlik brought defendant to a room where Grossman was waiting with "a paper written out sitting on the desk." Stehlik asked him to sign the paper. Defendant was not given a chance to review the statement, and he was not told its contents. At Stehlik's direction, defendant signed the document and initialed it on several pages. He did so because he "was tired of being in that freezing room." Defendant had not eaten or slept.

¶ 25 On cross-examination with respect to Miggins's statement, defendant answered negatively when asked if Detective Kenneth Boudreau struck him. He acknowledged he signed and

---

[2]He could not see what the cuffs were attached to above him but said it "might have been a pole" or a "hook."

initialed the statement at several points, including where it stated that he had not been threatened. He maintained that he did not know that was included in the statement.

¶ 26    On cross-examination regarding the Miles statement, defendant recalled O'Brien put the book on defendant's side "and hit me with the rubber thing on my left side, but he hit the book." Defendant was taken to the room with air conditioning and left there for about "seven hours." He maintained that he never told Grossman anything about the Miles shooting and that the statement "was already written" when Grossman presented it to him.

¶ 27    2. Detectives' Testimony at the Motion to Suppress Hearing

¶ 28    Detective Kill testified that he and his partner, Detective John Halloran, investigated the Miggins shooting. At approximately 10 p.m. on August 21, 1991, Kill and Halloran interviewed defendant. Kill said that he unhandcuffed defendant from a ring on the wall and that, to his knowledge, defendant was not handcuffed after that point.

¶ 29    Kill read defendant *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and defendant said he understood them and wished to answer questions. After a 30-minute conversation, Kill and Halloran left the room. Kill returned at about 2:15 a.m. with Brent, who also gave *Miranda* warnings. After a conversation of 25 to 30 minutes, Kill left with Brent and defendant still in the room.

¶ 30    At about 7:45 a.m., Kill brought defendant to a room with a desk. At that time, the prior conversation "was reduced to writing" by Brent, and defendant signed the statement and initialed corrections.

¶ 31    Kill denied that Boudreau was present for either the 2:15 a.m. or 7:45 a.m. conversations. Kill denied he or any other detective ever kicked or slapped defendant. Kill said it was

"impossible" for defendant to have been cuffed with his hands above his head. Kill said defendant was given food from McDonald's before his statement was reduced to writing.

¶ 32    Kill acknowledged that, on the same night, he was also interviewing codefendants Johnson and Sutton regarding the Miggins shooting. Kill denied that he referenced Johnson's statements when he spoke to defendant. Kill specifically denied ever telling defendant that they knew he was not the shooter or telling him that he would "die in Joliet" if he did not talk.

¶ 33    Kenneth Boudreau testified he was Kill's partner and was at Area 3 on the night of defendant's arrest. Boudreau helped interview other witnesses for the Miggins shooting investigation but denied he was present for any interviews with defendant. Boudreau recalled that he bought food for the arrestees sometime in the early morning, but he denied any other contact with defendant.

¶ 34    Detective Joseph Stehlik testified that on August 22, 1991, he interviewed defendant in connection with Miles's June 1991 shooting. Stehlik and his partner, James O'Brien, brought defendant to an interview room around 1:15 p.m. Defendant indicated he understood his *Miranda* rights and agreed to speak with them.

¶ 35    Stehlik was present when ASA Grossman spoke with defendant around 5 p.m. and again at around 7 p.m. At approximately 8:30 p.m., Grossman took defendant's handwritten statement and reviewed it with defendant. Defendant signed each page of the statement, as did Stehlik and Grossman. Stehlik denied that defendant ever complained of abuse by any detective. He specifically denied that O'Brien hit the defendant in the ribs.

¶ 36    O'Brien testified he and Stehlik interviewed defendant around 1:15 p.m. and they spoke for about 30 minutes. O'Brien stated that he did not participate in any other interview of

defendant. O'Brien denied that he struck defendant or that he saw anyone else kick, slap, or punch defendant. He never saw defendant handcuffed on that day.

¶ 37    Grossman testified that, in connection with the Miles shooting investigation, he went to the station on August 22, 1991. With Stehlik and O'Brien present, Grossman advised defendant of his *Miranda* rights, after which they had a conversation. Later that evening, Grossman had a second conversation with defendant, again with the detectives present. After that conversation, Grossman asked defendant if he wanted to keep his statement as an oral statement, if he wanted Grossman to reduce it to writing, or if he wanted to have a court reporter take his statement. Defendant indicated he wanted a handwritten statement.

¶ 38    Around 8:30 p.m., Grossman met with defendant outside the presence of detectives. Grossman asked defendant if he needed anything and asked how he had been treated. Defendant said he did not need anything and that "he's been treated fine." Defendant never told Grossman that anyone had hit him or that he was left in a cold room.

¶ 39    Grossman took defendant's handwritten statement with Stehlik present. Grossman presented defendant with printed *Miranda* warnings, which defendant read and signed to indicate his understanding.[3] Grossman then questioned defendant and wrote out a statement,

---

[3]The record shows that the statements in both the Miggins case and the Miles case were written on forms that included the following preprinted paragraph: "I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement." Defendant's signature appears directly below that paragraph on both statements. Following these preprinted warnings, the substance of the statements was handwritten by Brent and Grossman.

The record does not reflect that defendant was asked to sign a preprinted *Miranda* waiver form that was wholly *separate* from the forms containing the incriminating statements about the murders. Use of such an additional signed waiver document gives courts and reviewing courts extra evidence from which to determine that a defendant's statement to police was, in fact, voluntary. See, *e.g.*, *People v.*

which he reviewed with defendant. Defendant signed at the bottom of each page and initialed corrections. Within the statement, defendant acknowledged that he had been treated well.

¶ 40    Brent testified that as of August 1991, he was an ASA. He met with defendant and Kill around 2:15 a.m. on August 22, 1992. After Brent advised defendant of his *Miranda* rights, they spoke for about half an hour with Kill present. When Kill left, Brent asked defendant how he was treated. Defendant said he was treated "fine" and had no complaints.

¶ 41    Defendant asked Brent to write down his statement. At about 7:45 a.m., Brent met with defendant with Kill present. Brent asked defendant to read and sign a preprinted statement of his *Miranda* rights, and defendant complied. With Kill present, Brent wrote down what defendant told him. Brent went over the statement with defendant, who made a number of corrections. Defendant signed every page of the statement.

¶ 42                                3. Ruling on Motion to Suppress

¶ 43    The trial court denied the motion to suppress, finding that defendant was advised of his *Miranda* rights and that he never asked for an attorney. The court found that defendant was not "physically coerced" and that the statements were not the product of psychological or mental coercion.

¶ 44                            D. Defendant's Guilty Plea in the Miles Case

¶ 45    In May 1994, defendant pleaded guilty in the Miles case to first degree murder and three counts of attempted first degree murder. As part of the factual basis, the State noted that

---

*Buschauer*, 2022 IL App (1st) 192472 (finding waiver memorialized by signed waiver form was valid, despite the fact that suspect did not know that police had already obtained warrant for his arrest). We encourage the use of such additional documentation to better ensure that a defendant's waiver of his *Miranda* rights is voluntary, knowing, and intelligent. See *People v. Braggs*, 209 Ill. 2d 492, 515 (2003) ("A valid waiver of *Miranda* rights must be knowingly and intelligently made.").

defendant gave inculpatory oral and written statements. The court sentenced defendant to 40 years for murder and concurrent sentences of 20 years on each of the attempted murder counts.

¶ 46                     E. Defendant's Testimony at the Trial of the Miggins Case

¶ 47        In the Miggins case, the State proceeded to trial on charges of felony murder, attempted murder of Anthony Wilson and Steven Crosby, and aggravated battery with a firearm. Defendant testified at his bench trial in November 1994. He recalled that on the date of the shooting, Eric Clark told him and Johnson that Clark was driving Johnson's "Delta 88" vehicle when Clark was shot at by someone named Lamont. Johnson asked defendant to help him retrieve the Delta 88 vehicle. Defendant drove them to the area in a Chevrolet, where they saw the Delta 88 in an alley. When Johnson exited the Chevrolet, defendant saw that Johnson had a gun. Defendant heard shots and saw Johnson shoot at "Mike." Johnson ran back to the Chevrolet, and defendant drove them away as Mike shot at them. Defendant testified the only reason he went to the scene was to help find Johnson's vehicle.

¶ 48        On cross-examination, defendant acknowledged that he spoke to ASA Brent and signed a statement on August 22, 1991. The following exchange ensued:

> "Q. Now, let me ask you at the end of that statement *** you told
>
> the state's attorney in there you had been treated well by the police and
>
> the assistant state's attorney, right?
>
> A. Yes.
>
> Q. That was true, right?
>
> A. Yes.

Q. You also stated that you weren't made any promises in return for the statement nor you weren't threatened in any way. You told that to the state's attorney?

A. Yes.

Q. That was true, right?

A. Yes.

Q. You told the state's attorney you were offered both food and water and they were, brought food from McDonald's, right?

A. Yes.

Q. That was true?

A. Some of it.

Q. Some of it.

A. Yes.

Q. You told the state's attorney that you were free from the effects of drugs and alcohol, that was true?

A. Yes.

Q. So you weren't treated badly by the police?

A. No."

¶ 49    The trial court found defendant guilty of first degree murder, attempted first degree murder, and aggravated battery with a firearm. The court sentenced defendant to natural life for first degree murder, as well as 25 years for attempted first degree murder.

¶ 50    F. Direct Appeal of the Miggins Conviction

¶ 51        On direct appeal in the Miggins case, we affirmed over defendant's contention that the State failed to prove his guilt beyond a reasonable doubt. *People v. Anderson*, 277 Ill. App. 3d 1100 (1996) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 52                                    G. Prior Collateral Proceedings

¶ 53        Defendant filed four unsuccessful petitions, which are summarized in the May 2010 opinion affirming dismissal of his fourth postconviction petition. *People v. Anderson*, 401 Ill. App. 3d 134 (2010). In June 2010, defendant filed a *pro se* motion to vacate the murder conviction in the Miggins case. On May 20, 2013, this court affirmed the dismissal of that petition on *res judicata* grounds. *People v. Anderson*, 2013 IL App (1st) 111059-U.

¶ 54        On March 2, 2011, defendant filed a "Combined Petition for Relief Under the Post-Conviction Hearing Act and for Relief From Judgment under Section 2-1401 of the Code of Civil Procedure," which corresponded to both the Miles and Miggins cases.[4] See 725 ILCS 5/122-1 *et seq.* (West 2010); 735 ILCS 5/2-1401 (West 2010). On the same date, he filed a "Motion for Leave to File a Successive Petition for Post-Conviction Relief." Defendant's March 2011 filings largely consisted of claims of police torture. With respect to the Miggins case, defendant additionally asserted a claim of actual innocence premised on a new eyewitness affidavit from Bertrum Anderson, as well as the State's failure to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

¶ 55        On November 23, 2011, the trial court entered an order in the Miles case that dismissed the section 2-1401 petition but advanced the postconviction petition for second stage proceedings. The court stated it was doing so only because it was unable to locate the file for the Miles case

---

[4]On April 26, 2011, defendant informed the court that he wished the combined petition to apply to the Miles case as well as the Miggins conviction.

number and 90 days had elapsed since the filing. Defendant subsequently moved to hold that petition "in abeyance," pending the outcome of TIRC proceedings.

¶ 56    On November 23, 2011, the trial court issued an order in the Miggins case denying leave to file a successive petition and dismissing the section 2-1401 petition. In appeal No. 1-12-1321, defendant challenged the denial of leave to file a successive petition, insofar as it relied on the new affidavit and the alleged *Brady* violation. That appeal did not raise any argument concerning defendant's claims of police torture. On September 6, 2022, this court issued an order reversing the denial of defendant's motion for leave to file a successive postconviction petition, remanding for further proceedings with respect to defendant's actual innocence and *Brady* claims. *Anderson*, 2022 IL App (1st) 121321-U.

¶ 57                    H. Defendant's TIRC Claim and TIRC Referral

¶ 58    In May 2011, defendant submitted a claim of torture with the TIRC, pertaining to his convictions in both the Miles and Miggins cases. In support, he submitted an eight-page affidavit describing abuse by detectives, including Kill, Boudreau, Halloran, Stehlik, and O'Brien. He alleged that Kill kicked his handcuffs and that Boudreau and Halloran slapped and punched him before he signed the statement in the Miles case. Elsewhere in the affidavit, defendant recalled that O'Brien took a pipe from Stehlik, put a telephone book on defendant's left side, and struck the book several times. Defendant further averred that he experienced pain in his left side and blood in his urine in the following months. He stated that he was diagnosed with "UPJ obstruction" caused by trauma to his left kidney, for which he underwent surgery in March 1993.

¶ 59    The TIRC issued its disposition in June 2012 and issued an amended disposition in March 2014, in which it found defendant's "[c]laim is credible and merits judicial review." The TIRC

found that defendant had "consistently claimed since his motion to suppress to have been tortured in the manner alleged" and that his claim was "strikingly similar to other claims of torture" documented in investigations of Jon Burge and officers under his command.

¶ 60    The TIRC noted that the detectives identified by defendant were accused of abuse by numerous other claimants. Specifically, TIRC records showed that O'Brien was accused by over 30 individuals of physical abuse and coercion, Boudreau was accused by over 35 individuals, Kill was accused by 20 persons, and Halloran was accused by over 35 individuals. The TIRC noted that one claimant, Ivan Smith, alleged that O'Brien and Stehlik beat him through a phonebook, which was "strikingly similar" to defendant's allegations.

¶ 61            I. Circuit Court Evidentiary Hearing Following TIRC Referral

¶ 62    Following the TIRC's referral to the circuit court, the matter was assigned to Honorable William H. Hooks. Judicial review of defendant's TIRC claim was consolidated with the review of Anthony Jakes's TIRC claim, in which Jakes alleged that Kill and Boudreau coerced his confession.[5] The circuit court conducted an evidentiary hearing that commenced in July 2015 and included testimony by a number of witnesses, including defendant and several of the accused officers, over the next few years.[6] Defendant asked that the court vacate his convictions, order new trials, and suppress his statements.

¶ 63        1. Defendant's Evidentiary Hearing Testimony Regarding the Miggins Statement

---

[5]During the course of the evidentiary hearing, Jakes's claim was resolved when the State moved to vacate his conviction and dismissed the charges against him. Jakes eventually obtained a certificate of innocence. *People v. Plummer*, 2021 IL App (1st) 200299, ¶ 91.

[6]The record reflects that Kill did not testify regarding defendant's allegations at the evidentiary hearing and that he is now deceased.

¶ 64    Defendant testified that when he was brought to Area 3 on August 21, 1991, Kill handcuffed him to a ring on the wall and left him alone for what seemed like "hours." When Kill returned, defendant asked what he was being charged with. Kill told him he had "killed that little boy." Defendant denied that he killed anyone and said that he wanted an attorney. Kill did not respond and left.

¶ 65    Sometime later, Kill, Halloran, and Boudreau entered the room and asked if he was ready to talk. Defendant, still handcuffed, said he wanted an attorney. The detectives then left him for what seemed like "hours." When they returned, Kill "kicked the handcuffs and my arm, and Halloran and Boudreau punched me in the chest and hand" before leaving him again.

¶ 66    At some point, the same three detectives returned, and Kill told defendant that he would "die in Joliet" if he did not cooperate. The detectives left again and returned with ASA Brent. When defendant told Brent that he wanted a lawyer, he was left alone again. Sometime later, the same three detectives returned and told defendant to "tell [Brent] what happened." When Brent came into the room, defendant again requested an attorney. At that point, Kill "told me in front of the State's attorney that I was going to die in Joliet if I didn't talk to him."

¶ 67    The detectives later moved him to a room with a desk, where Brent was waiting. When defendant again said he wanted an attorney, Brent left. Kill told defendant that he was going to talk to Brent "or else" and directed defendant as to what he should say.

¶ 68    Kill, Halloran, and Boudreau remained in the room when Brent returned. Kill put his hand on defendant's shoulder, and defendant felt pressured and scared. Defendant spoke to Brent, who wrote out the statement. Defendant did not have an opportunity to read the statement but signed it "[b]ecause Detective Kill and Boudreau and Halloran told me to." Defendant had not slept or eaten from the time of his arrest.

¶ 69                      2. Defendant's Testimony Regarding the Miles Interrogation

¶ 70        Defendant testified that, after he signed the Miggins statement, he was taken to a different room with lockers and handcuffed to a radiator. After what seemed like hours, three different detectives (O'Brien, Stehlik, and Smith) entered the room and questioned him about the Miles shooting that occurred in June 1991. Defendant said he did not know what they were talking about and asked for an attorney. He was then left alone for two hours.

¶ 71        O'Brien and Stehlik eventually brought him to a different room and asked if he was "ready to tell them what happened on June 9th." Defendant again requested an attorney. The detectives took him back to the room with lockers and "handcuffed me with both hands over my head."

¶ 72        When the detectives returned, defendant saw Stehlik with a "black pipe," which he gave to O'Brien. O'Brien placed a telephone book on defendant's left side and struck the book five or six times with the pipe. Meanwhile, Stehlik "was in my ear telling me to talk to him."

¶ 73        O'Brien and Stehlik later brought him to another room, handcuffed him to a radiator, and turned the air conditioner on. He was left for a "long time" before they returned with ASA Grossman. When defendant told Grossman he wanted an attorney, he was left alone in the room. At one point he told the detectives he was cold; they responded that they would turn off the air conditioning "once [he] got through with the state's attorney."

¶ 74        After a number of hours, O'Brien and Stehlik eventually brought him to another room where Grossman was waiting. There was a paper on the table. Grossman told defendant "this is what Detectives Stehlik and O'Brien believe went on out there that day" and that defendant was going to sign it. Defendant signed and initialed it, where Grossman directed him to, because he did not want to go back to the cold room. He did not have a chance to review the statement.

¶ 75                                    3. Defendant's Medical Testimony

¶ 76        Defendant recalled that, when he was brought to jail, he told a "medical person" that he had been attacked by police. That person told him that, because he did not have bruises, there was "nothing [he] can do."

¶ 77        After about a week in jail, defendant had pain where he was struck on his left side, as well as blood in his urine and a high fever. He was prescribed antibiotics and felt better for a "little while." Sometime later, he again experienced blood in his urine, fever, and nausea. Defendant recalled three incidents where he "passed out" after similar symptoms. After the third instance in December 1992, he was hospitalized. In March 1993, he had surgery for a ureteropelvic junction (UPJ) obstruction on his left side.[7] Defendant testified that he had not mentioned the UPJ obstruction or surgery when he testified at the suppression hearing because he was advised by his counsel that the judge would not believe it.

¶ 78        Defendant testified that he plead guilty in the Miles case to avoid the death penalty and because he "didn't feel I could win at trial after [the judge] denied the motion to suppress." Regarding the Miggins case, defendant acknowledged he did not describe police abuse in his trial testimony. Defendant said he and his trial attorney decided "not to bring it up because he was trying to save my life" and avoid the death penalty. Defendant testified that he was surprised when the State cross-examined him about how he had been treated by police and that he made a "mistake" when he agreed on cross-examination that he had been treated well.

¶ 79                                4. Testimony From Defendant's Former Counsel

_____

[7]"Ureteropelvic junction obstruction is a condition where blockage occurs at the junction where the ureter attaches to the kidney." Johns Hopkins Medicine, Ureteropelvic Junction Obstruction, https:// www.hopkinsmedicine.org/health/conditions-and-diseases/ureteropelvic-junction-obstruction (last visited June 17, 2024) [https://perma.cc/T383-CM6B].

¶ 80      Honorable Stuart Katz testified that in 1991 he worked for the Cook County Public Defender's Office. He had no independent recollection of representing defendant but acknowledged that he drafted the motion to suppress. Judge Katz acknowledged that the motion to suppress did not reference defendant being struck with a pipe or suffering any medical problems. The case was assigned to another public defender before the hearing on the motion to suppress.

¶ 81      Honorable Thomas J. O'Hara, an associate judge of the circuit court of Cook County, testified that he was a public defender in 1991 and represented defendant in the Miles and Miggins cases. He recalled that defendant was facing the death penalty. Regarding defendant's trial testimony in the Miggins case, O'Hara recalled telling defendant that "we would not go into" his claims of police abuse on direct examination because the same trial judge had denied the motion to suppress. O'Hara had no recollection of defendant telling him that he was treated at a hospital or had surgery for injuries caused by police.

¶ 82                        5. Lay Witnesses Called by Defendant

¶ 83      Robert Tenny testified that he was in Cook County Jail with defendant in 1992. Tenny recalled an occasion where defendant passed out in jail and was "stretched out on the floor."

¶ 84      Anna Anderson testified that she is defendant's cousin. She testified that, when she visited him in jail sometime after his arrest, he told her that detectives kicked his hands while handcuffed, "hung him up like a slave and beat him," put a "phone book on his side and beat him with something black," and left him in a room that was "freezing." He later told her about an incident where he "passed out" and was treated at Cermak hospital.

¶ 85      Rosalyn Anderson, defendant's wife, similarly testified that, during a jail visit, defendant told her that police "hung him from a pole with his handcuffs," beat him in the side with the

telephone book and a pole, and put him in a "freezing" room. He later complained about pain in his side and problems urinating.

¶ 86     Brenda Hoover testified that, when she visited defendant a few days after his arrest, he was in pain and holding his left side. He told her that police had beaten him up. Joanne Goldman, the mother of one of defendant's children, similarly testified that defendant appeared to be in pain when she visited him in jail. Defendant told her that he had been "questioned for hours and handcuffed to a wall and was jumped on."

¶ 87                     6. Ivan Smith's Pattern and Practice Testimony

¶ 88     Defendant called Ivan Smith (Ivan) as a pattern and practice witness. Ivan recalled that in November 1991, when he was 20 years old, he was arrested in Tennessee in connection with a murder in Chicago. While jailed in Tennessee, he was interrogated by O'Brien and Stehlik, as well as Mike Smith, an ASA. When Ivan said he wanted his attorney present, O'Brien slapped him in the face. The detectives told him they wanted him to testify against another individual. When Ivan refused, O'Brien slapped him in the back of the head. When Ivan tried to stand up, he was handcuffed behind his back. When he said he wanted his lawyer, O'Brien "started punching me in my chest."

¶ 89     The detectives then forced Ivan to lie on his back. Stehlik placed a phone book on his chest and then struck the book with an object that looked like a wooden stick. As Stehlik was hitting him, O'Brien was asking if he was ready to cooperate. Stehlik and O'Brien later switched places, with O'Brien striking him in the chest until he agreed to provide a statement. Ivan said he did not have any marks on his body after the beating.

¶ 90                     7. Martin Reeves's Pattern and Practice Testimony

¶ 91     Martin Reeves testified that he had been convicted of murder in 1988 but was later exonerated and won a wrongful conviction suit.

¶ 92     Reeves recalled that on August 26, 1988, officers brought him to Area 3, where he was cuffed to a ring on the wall. Detective Kill and another officer (whom Reeves did not name) showed him photos of crime victims, including a "charred body." Reeves denied knowing the victims, but the unnamed officer told him that "you did this, and you're going to pay for it."

¶ 93     Reeves was transported by an officer to another location for a lie detector test. On the way back, the officer told him he failed the test and struck him in the face. He was brought back to a room at Area 3 and handcuffed to the wall. Reeves recalled that officers Dowley and Peteck beat him as he was cuffed to the wall and that Dowley threatened to shoot him. At another point, Peteck kicked him in the chest and walked out.

¶ 94     Eventually, Kill came in and asked Reeves if he was hungry. When Reeves answered yes, Kill handed him a piece of paper and told him that, if he signed it, he could eat and go home. Reeves read the paper, which contained a confession. Kill left when Reeves refused to sign the paper. Reeves heard Kill tell the other officers: "That n*** can read."

¶ 95                              8. Documentary Pattern and Practice Evidence

¶ 96     In addition to the testimony of Ivan Smith and Reeves, defendant submitted voluminous documentary "pattern and practice" evidence relating to allegations in other cases by numerous other individuals claiming abuse or coercion. The documentary evidence includes prior hearing and deposition testimony, motions to suppress, witness affidavits, expert reports, and postconviction filings relating to allegations made by individuals including Cortez Brown (also known as Victor Safforld), Harold Hill, Daniel Young, Nicholas Escamilla, Tyrone Reyna, Jerry Gillespie, Jason Gray, Peter Williams, Oscar Gomez, Eric Gomez, Johnnie Plummer,

Ronald Kitchen, Terrill Swift, Kilroy Watkins, Jesse Clemon, Marcus Wiggins, Clayborn Smith, Samhan Ali, Glen Dixon, Bobby Spencer, Gregory Logan (also known as Gregory Reed), Andre Altman, Eric Jackson, and Maurice Lane.

¶ 97    Many of those complaints alleged involvement by one or more of the detectives accused by defendant and in the same time period as defendant's August 1991 interrogation. For example, Altman and Jackson filed a federal lawsuit in which they alleged that O'Brien and Stehlik beat and struck them in November 1991 after they refused to stand in a lineup. Watkins testified that, in January 1992, Boudreau struck and choked him during an interrogation. Watkins testified that Boudreau, Halloran, and an ASA gave him a "prepared statement" that they asked him to sign. Harold Hill testified that Halloran and Boudreau struck him and that Boudreau told him the information to include in his inculpatory statement in March 1992. Maurice Lane alleged that O'Brien choked, kneed, and slapped him in July 1992. In a deposition related to Hill's federal lawsuit, Clayborn Smith testified that Halloran hit and kicked him during interrogations in October 1992.

¶ 98    The pattern and practice evidence also included O'Brien's November 2008 deposition testimony in Hill's federal litigation, *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 2637214 (N.D. Ill. July 6, 2011). O'Brien invoked the fifth amendment dozens of times when asked if he interrogated, threatened, or used force against numerous individuals in police custody. O'Brien likewise invoked the fifth amendment when asked if he placed a telephone book on Ivan Smith's chest and struck the book with a nightstick.

¶ 99    The record also includes Halloran's deposition in Hill's lawsuit. Halloran took the fifth amendment in response to virtually every question, including when asked whether he, Boudreau, O'Brien, or other detectives struck numerous individuals in the 1990s.

¶ 100     The evidence also included O'Brien's May 2009 testimony from Cortez Brown's postconviction proceedings. O'Brien invoked the fifth amendment when asked whether he learned to abuse detainees without leaving a mark on their bodies and whether he coerced confessions of several individuals in the late 1980s and early 1990s.

¶ 101                    9. Defendant's Medical Witness

¶ 102     Dr. John Cudecki testified that, in 1993, he performed surgery on defendant at Cook County Hospital for UPJ obstruction, which is a "blockage of the kidney where the renal pelvis becomes the ureter." A UPJ obstruction has a number of possible causes, including trauma. He testified that, if someone is struck on the side with his arms raised, it could increase the likelihood of a UPJ obstruction. Dr. Cudecki agreed it was "possible" that the trauma defendant allegedly suffered by detectives could be related to his UPJ obstruction.

¶ 103          10. The State's Witness Testimony Regarding the Miggins Statement

¶ 104                              a. Boudreau

¶ 105     Boudreau testified that on the evening of August 21, 1991, he and Kill became involved in investigating the Miggins shooting. Detectives Halloran and Smith handled the investigation "during the day shift." Boudreau and Kill were asked to assist due to the number of victims, witnesses, and suspects.

¶ 106     Boudreau interviewed other suspects, but he denied that he interviewed defendant or that he was involved in taking defendant's statement. He denied seeing Kill or Halloran kick or hit defendant. Boudreau recalled buying food for detainees, but he denied any other contact with defendant.

¶ 107                              b. Halloran

¶ 108 Halloran testified that he and his partner, John Smith, investigated the Miggins murder on August 21, 1991. Halloran and Smith moved defendant into an interview room around 8:30 p.m. Halloran recalled he handcuffed defendant to a ring on the wall because the door to the room was not secure.

¶ 109 Around 10 p.m., Halloran and Kill reentered the room. After Kill read defendant his *Miranda* rights, they had a conversation of about 30 minutes regarding the events surrounding Miggins's shooting. Halloran testified that defendant did not ask for an attorney. Halloran denied that he or Kill ever kicked, struck, or otherwise abused defendant. Halloran testified that Boudreau was not present when he met with defendant. Halloran was not present when defendant signed his statement.

¶ 110                                    c. Brent

¶ 111 The court considered Brent's June 2018 deposition testimony. Brent recalled meeting with defendant and Kill. After Brent informed defendant of his *Miranda* rights, they had an initial conversation for about a half hour. Kill subsequently left Brent in the room alone with defendant. Brent asked defendant how he was treated by police, and defendant "had no complaints." Brent denied that defendant ever said he was struck or abused by any detective or that defendant asked for an attorney.

¶ 112 Brent recalled that Kill was the only other detective who was present when defendant's statement was taken and that there was "no intimidation whatsoever." Brent reviewed the statement with defendant before defendant signed it. He did not see any detective strike, kick, or threaten defendant.

¶ 113                    11. State's Witness Testimony Regarding the Miles Statement

¶ 114                                    a. O'Brien

¶ 115 O'Brien recalled that he was investigating the Miles shooting when defendant became a person of interest. On August 22, 1991, he learned that defendant was in custody. O'Brien and Stehlik interviewed defendant that afternoon for about half an hour. O'Brien denied that he or Stehlik ever threatened, kicked, slapped, or otherwise made contact with defendant. He denied that any object was used to strike him. O'Brien also testified there was no air conditioning in the Area 3 building.

¶ 116 O'Brien acknowledged that he and Stehlik interviewed Ivan Smith in Tennessee, but he denied that Ivan Smith was mistreated.

¶ 117 On cross-examination, O'Brien acknowledged that he asserted his fifth amendment rights when asked in prior proceedings whether he had mistreated numerous other detainees, including Ivan Smith.

¶ 118                                         b. Stehlik

¶ 119 Stehlik acknowledged that he was present when Grossman questioned defendant. Stehlik said defendant "was never cuffed." Stehlik recalled that defendant agreed to have his statement reduced to writing by Grossman and that defendant had a chance to review the statement. Stehlik denied that defendant was ever struck or threatened or that he asked for a lawyer. Stehlik said the air conditioner was broken in the room where defendant gave his statement.

¶ 120 Stehlik recalled going to Tennessee with O'Brien to extradite Ivan Smith. He recalled that he and O'Brien interviewed Ivan Smith but denied that they threatened or struck him.

¶ 121                                      c. ASA Grossman

¶ 122 Brian Grossman recalled that on the afternoon of August 22, 1991, he met with defendant and advised him of his *Miranda* rights. He then had an initial conversation with defendant for about an hour regarding the Miles homicide. At about 7 p.m., Grossman met with defendant

and Stehlik. During that conversation, defendant indicated he wanted Grossman to write up his statement. At one point, Grossman spoke to defendant outside the presence of detectives and asked how the police had treated him. Defendant "acknowledged they treated him well." Later that evening, Grossman took defendant's statement with Stehlik present. Grossman reviewed each page with defendant and gave him an opportunity to make corrections. Defendant said he had been treated well and denied that he had been threatened.

¶ 123                                    12. The State's Medical Expert Witness

¶ 124        The State called Dr. Mark Jonathan Schacht as an expert witness. Dr. Schacht opined that defendant had a "bilateral UPJ obstruction," which is congenital, meaning he was born with it. Dr. Schacht opined that trauma did not cause defendant's bilateral UPJ obstruction. Dr. Schacht testified that trauma to the kidney significant enough to cause bleeding would do so within the first 36 hours, not weeks later as indicated by defendant's affidavit. He acknowledged defendant's March 1993 surgery but testified that the medical records did not reflect the number of infections and hospitalizations defendant described in the affidavit.

¶ 125                                    13. The State's Testimony to Rebut Ivan Smith

¶ 126        The State called additional witnesses to rebut Ivan Smith's testimony that he was abused in Tennessee by Stehlik and O'Brien.

¶ 127        The Honorable Charles Burns testified that, in 1991, he was an ASA when he was contacted regarding Ivan Smith in connection with a homicide. He went to Tennessee with O'Brien, Stehlik, ASA Michael Smith, and a court reporter. Burns spoke to Ivan Smith in the presence of Stehlik and O'Brien. Ivan Smith agreed to give a statement after being read his *Miranda* rights. Burns recalled that Ivan Smith did not appear to be in pain or complain that he was harmed. Burns never saw O'Brien or Stehlik harm Ivan Smith.

¶ 128      Michael Smith testified that he was an ASA when he traveled to Tennessee, along with Stehlik, O'Brien, and Burns. ASA Smith was not present for Ivan Smith's initial questioning and did not take Ivan's statement. ASA Smith said that Ivan Smith's demeanor was relaxed and he did not complain about how he had been treated. However, ASA Smith acknowledged he did not know what happened during the detectives' questioning of Ivan.

¶ 129      14. Defendant's Posthearing Submission

¶ 130      Defendant's posthearing brief argued that, in light of the new evidence, defendant was entitled to new trials in both the Miles and Miggins cases and that the State should be prohibited from using his custodial statements. Defendant argued that he had met his burden to show that the new pattern and practice evidence impeached the officers' credibility to the extent "a suppression motion would have reached a different result." Defendant also noted that "it is the State who, in the suppression context, bears the burden of showing voluntariness."

¶ 131      In arguing that the detectives' credibility was impeached by the pattern and practice evidence, defendant contended that the prior allegations were relevant because they involved the same detectives who interrogated defendant and involved allegations of physical abuse between the late 1980s and mid-1990s. Defendant noted that the convictions of several of those accusers were ultimately overturned. Defendant also argued that an adverse inference was warranted in light of Halloran, O'Brien, and Boudreau's invocation of the fifth amendment in prior proceedings. Defendant elsewhere argued that his core testimony was consistent since the January 1994 motion to suppress hearing, notwithstanding that he "did not know the identities of all of the officers" when the motion to suppress was filed and notwithstanding any minor discrepancies in his recollection of "the exact things that Detective Boudreau and Halloran did and when they did them."

¶ 132                    J. The Trial Court's Posthearing Decision

¶ 133        The trial court initially entered an order denying defendant relief on January 16, 2020. On March 16, 2020, the court entered a 49-page amended order containing its posthearing conclusions of law and facts, which is the focus of this appeal.[8] The written order contains a number of discrete sections.

¶ 134        In the section titled "Legal Standard," the court stated that defendant's initial burden under the TIRC Act was not to prove his confession actually resulted from coercion but to show that "newly discovered evidence would likely have altered the result of a suppression hearing." The court further stated that if the defendant met that initial burden, then the burden "shifts to the State of proving the statement was voluntary."

¶ 135                         1. The Trial Court's Findings of Fact

¶ 136        The court proceeded to list its "Findings of Fact" over 147 numbered paragraphs. In so doing, it consistently credited the State's witnesses while finding defendant's account untruthful. With respect to the Miggins case, the court credited Halloran's hearing testimony, including his denials that he or Kill kicked or struck defendant. The court separately credited Boudreau's testimony that he did not interview defendant. The court also credited Brent's testimony that he advised defendant of his *Miranda* rights and that defendant had "no complaints" about how he was treated by police. The court specifically found that defendant's claim that he told Brent he wanted an attorney was a "lie."

_____

[8]Defendant commenced this appeal on February 10, 2020, by filing a notice of appeal from the January 16, 2020, order. However, in light of the trial court's amended order in March 2020, this court allowed defendant leave to file an amended notice of appeal that challenged the trial court's amended order. At oral argument, defendant's counsel confirmed that the March 2020 amended order is the focus of this appeal.

¶ 137    The court further found that defendant elected to give a statement and that Brent wrote down what defendant stated in Kill's presence. The court found that there "were not multiple detectives in the room" and that Kill "was not hovering over" defendant when he gave the statement. The court also made findings that Kill did not tell Brent what to include in the statement and that Brent reviewed the statement with defendant.

¶ 138    The court found "no credible evidence" that Kill, Boudreau, or Halloran punched, hit, or kicked defendant in connection with the Miggins case. The court emphasized its finding that the Miggins statement was voluntary, not coerced.

¶ 139    The court similarly found no abuse or coercion with respect to the Miles statement. The court specifically found "no credible evidence" that defendant "was hung by handcuffs from the top of a locker," that he was forced to stay in a cold room, or that O'Brien or Stehlik struck a phone book held to his side. The court credited Grossman's testimony that he advised defendant of his *Miranda* rights, that defendant did not ask for an attorney, and that defendant said he was treated well by the police. The court also credited Dr. Schact's testimony that defendant's UPJ obstruction was congenital and not caused by trauma.

¶ 140    In separate subsection, titled "George Anderson's Judicial Admissions," the court noted that, at the trial of the Miggins case, defendant agreed that he told Brent that he was treated well by the police and was not threatened. The court emphasized that, when defendant was asked "So you weren't treated badly by the police," he answered "No."

¶ 141    2. The Trial Court's Pattern and Practice Findings

¶ 142    The trial court's decision made additional findings in which it discounted all of the evidence that the accused detectives abused other individuals. The court rejected Ivan Smith's

testimony about his interrogation in Tennessee, citing the State's witness testimony and finding "Ivan Smith was not physically abused by either Detective O'Brien or Detective Stehlik."

¶ 143    With respect to the numerous other individuals who alleged abuse by the police officers who interrogated defendant, the court determined that such evidence was either irrelevant, that defendant had "waived" reliance on such evidence, or that there was insufficient evidence to support the claims of abuse or coercion. The court found any other claimants' allegations against Boudreau were "irrelevant" because defendant testified at the hearing on his motion to suppress that Boudreau never touched him. The trial court also disregarded any pattern and practice evidence alleging misconduct by Halloran because Halloran was not identified in defendant's motion to suppress.

¶ 144    The court further disregarded as irrelevant any claims of abuse that were deemed by the Office of Professional Standards (OPS) to be unfounded or "not sustained." The court also found that defendant had "waived" reliance on any prior claimant's accusations, if defense counsel had not specifically asked the accused officer about the specific claim during the evidentiary hearing.

¶ 145                      3. The Trial Court's "Conclusions of Law"

¶ 146    In the portion of the order titled "Conclusions of Law," the court did not reference the inquiry it previously identified in its "Legal Standard" section—*i.e.*, whether defendant had shown that the new evidence would likely have resulted in suppression. Instead, the court indicated that its only role was to determine whether defendant's statements were coerced:

> "The issue for determination at a hearing convened pursuant to 775
>
> ILCS 40 is whether petitioner has met his burden of proving by a
>
> preponderance of evidence that his confession was a result of

physical coercion or torture. This is the sole issue to be determined

by the Court at the hearing."

¶ 147    The court proceeded to find "no evidence of medical injury" consistent with defendant's

claims of abuse. The court reiterated its findings that defendant had not asked for an attorney,

that he read the statements before he signed them, and that he did not complain to Brent or

Grossman about any abuse.

¶ 148    With respect to the Miggins case, the court again emphasized that defendant testified at

trial "that he was treated well by the police," finding this testimony was a judicial admission

and "*demonstrated that his statements were voluntarily given and that his statements were not

coerced*." (Emphasis in original.) With respect to the Miles case, the court found that

defendant's claims that he was "handcuffed to the top of a locker for several hours" or "forced

to stay in a freezing room" were "not credible," citing the detectives' contrary testimony.

¶ 149    Elsewhere in the "Conclusions of Law," the court stated that defendant "did not submit any

pattern and practice evidence relevant under *People v. Patterson*, 192 Ill. 2d 93 (2000)," with

respect to either the Miggins or Miles case. The court then stated that "the uncorroborated

testimony of petitioner, with his later-added embellishing details, does not meet his burden of

proof in face of the volume and quality of the evidence standing in opposition."

¶ 150                              4. The Trial Court's Conclusion

¶ 151    In its conclusion, the court emphasized its view that defendant's testimony was not credible

and that he "attempted to deliberately tailor his testimony" to obtain relief under the Act. The

court compared defendant to a "Ghost Rider," who falsely claims to have been a passenger in

a bus accident to fraudulently seek compensation, remarking that he "falsely claimed to have

ridden on the Burge[ ] torture bus." The court concluded that defendant "has not shown that he

was abused either physically or psychologically" by police and thus "failed to meet his burden by a preponderance of the evidence." Accordingly, the court denied him any relief.

¶ 152                                    5. Prior Opinion and Supreme Court Supervisory Order

¶ 153        This court issued an opinion in March 2023 in which we reversed and remanded for new trials. Shortly thereafter, defendant filed a motion seeking his release, noting that the vacatur of his convictions restored the presumption of innocence. We granted that motion by order dated April 12, 2023, and defendant was released on his own recognizance.

¶ 154        The State filed a petition for leave to appeal (PLA) from our March 2023 decision. In February 2024, our supreme court issued its opinion in *Fair*, 2024 IL 128373. In March 2024, our supreme court denied the State's PLA but issued a supervisory order directing us to vacate our judgment and to consider the effect of *Fair* "on the issue of whether the circuit court erred in denying relief to petition under the Illinois Torture Inquiry and Relief Commission Act and determine if a different result is warranted." *People v. Anderson*, No. 129568 (Ill. Mar. 27, 2024).

¶ 155        Following the supreme court's supervisory order, the State filed a motion in this court to vacate our April 2023 order releasing defendant on his own recognizance. Defendant filed his opposition to that motion, and this court allowed the State to file a reply. That motion was taken with the case and denied in this court's June 2024 opinion.

¶ 156        The State filed a petition for leave to appeal the June 2024 opinion. In November 2025, our supreme court denied the State's petition but entered a supervisory order directing this court to vacate the portion of our June 2024 opinion "directing that the case be assigned to a new judge on remand." *People v. Anderson*, No. 131208 (Ill. Nov. 26, 2025). Our supreme court

ordered us to reconsider that directive in light of *People v. Class*, 2025 IL 129695. Pursuant to that supervisory order, we have reconsidered our opinion.

¶ 157                                                    II. ANALYSIS

¶ 158         On appeal, defendant claims that he is entitled to suppression of the statements and a new trial due to a number of errors by the trial court.[9] He primarily claims that the trial court applied the wrong legal standard by engaging in a "personal, subjective adjudication of the evidence" rather than evaluating whether the new evidence would be likely to change the result at a new trial or suppression hearing. That is, he suggests the trial court improperly denied him relief because it "personally disbelieved" defendant's testimony and supporting evidence.

¶ 159         Defendant further argues the trial court erred in deeming all of the pattern and practice evidence irrelevant. Defendant urges that the trial court disregarded such evidence for a number of improper reasons.

¶ 160         Defendant additionally asserts that the trial court erred by not drawing an adverse inference from detectives' invocation of the fifth amendment in prior proceedings, that the court ignored medical evidence that corroborated his claims, and that the court erroneously found that a "judicial admission" arose from his trial testimony in the Miggins case. Finally, defendant asserts the trial court "failed to adjudicate" the claim that he was denied his right to counsel. We have reviewed the parties' contentions, in conjunction with *Fair*'s guidance as to the proper inquiry and standard of review, discussed *infra* section II.A. We find that the trial court referenced the correct inquiry, but its decision was nonetheless manifestly erroneous. See *infra*

---

[9]While this appeal was pending, we granted the motion of "Persons Concerned About the Illinois Criminal Justice System" to file a brief *amicus curiae* pursuant to Illinois Supreme Court Rule 345(a) (eff. Sept. 20, 2010).

section II.B. In so doing, we find that the trial court erred in ruling that none of the voluminous pattern and practice evidence was relevant (see *infra* sections II.C-I) and that its factual findings were against the manifest weight of the evidence. See *infra* section II.J. We also reject the State's claims that relief was independently barred by defendant's plea in the Miles case or by his prior testimony in the Miggins case. See *infra* sections II.K-L. We again conclude that defendant is entitled to suppression of the statements and new trials. However, pursuant to our supreme court's November 2025 supervisory order and *People v. Class*, 2025 IL 129695, we find there is insufficient basis to require that a new trial judge preside over subsequent proceedings on remand.

¶ 161                    A. The Act and Governing Standard at an Evidentiary Hearing

¶ 162          The Act "establishes an extraordinary procedure to investigate and determine factual claims of torture." 775 ILCS 40/10 (West 2018). Our supreme court has recognized the "history of police torture in Chicago that led to the legislative creation of the Act and its remedial purposes to identify victims and ameliorate the effects of those practices." *Fair*, 2024 IL 128373, ¶ 88 (citing 775 ILCS 40/10 (West 2018)).

¶ 163          The TIRC consists of eight voting members (775 ILCS 40/20(a) (West 2018)), who conduct inquiries into claims of torture and make "recommendations to the trial court at the completion of each inquiry" (*id.* § 35(5)). After hearing evidence, if a majority of TIRC members "conclude by a preponderance of the evidence that there is sufficient evidence of torture to merit judicial review," the case is referred to the chief judge of the circuit court of Cook County. *Id.* § 45(c). Following a TIRC referral, the circuit court is to conduct an evidentiary hearing, at which it "may receive proof by affidavits, depositions, oral testimony, or other evidence." *Id.* § 50(a).

¶ 164    The Act broadly describes the relief that may be granted after such hearing:

> "[I]f the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, bail or discharge, or for such relief as may be granted under a petition for a certificate of innocence, as may be necessary and proper." *Id.*

Our supreme court has thus recognized that "Section 50 allows circuit courts to afford successful petitioners essentially unlimited remedies *** including orders for retrial, discharge, or to issue a certificate of innocence." *Fair*, 2024 IL 128373, ¶ 68; see also *id.* ¶ 79 ("the Act provides the court with wide-ranging authority to craft an appropriate remedy to root out and ameliorate the effects of the tortured confession").

¶ 165    Consistent with *Fair*'s recognition that the Act affords "essentially unlimited remedies" to ameliorate the effects of a tortured confession (*id.*), this court is empowered to order suppression of a statement upon retrial, instead of merely remanding for a new suppression hearing. See *Wilson*, 2019 IL App (1st) 181486, ¶¶ 48-50 (overruled on other grounds by *Fair*).[10] This is consistent with the remedial goals of the Act as well as judicial economy. See *id.* ¶ 50.

¶ 166    The record in this case reflects that the evidentiary hearing in this case functioned as a simultaneous suppression hearing. Indeed, defendant explicitly sought outright suppression of

---

[10]Our supreme court in *Fair* expressly overruled *Wilson* with respect to the inquiry to be applied by the circuit court after a TIRC referral. 2024 IL 128373, ¶ 79. But *Fair* does not purport to limit the type of remedy available to a successful petitioner.

the custodial statements, rather merely seeking a new suppression hearing. Moreover, as the parties have acknowledged, the evidence considered at the evidentiary hearing is the very same evidence that would be considered upon any new suppression hearing.

¶ 167    We turn to address the proper inquiry to be applied by the circuit court, which has been clarified by *Fair*. In *Fair*, the circuit court held a hearing upon a TIRC referral but denied petitioner relief, finding he " 'failed to prove sufficient evidence of torture to meet his burden.' " 2024 IL 128373, ¶ 45. Before the supreme court, the parties disputed "the burdens of proof and production and with whom they rest in an evidentiary hearing following a Commission referral for judicial review." *Id.* ¶ 58. The *Fair* petitioner argued that

> "he was first required to make an initial showing that newly discovered evidence likely
> would have altered the result of a suppression hearing, the State then had the burden of
> proving a *prima facie* case of voluntariness, and finally, petitioner had a burden to
> prove the statements were involuntary by a preponderance of the evidence." *Id.* (citing
> *Wilson*, 2019 IL App (1st) 181486, ¶¶ 51-53).

The State argued that the plain language of the Act required courts to determine whether the petitioner has proved a torture claim by a preponderance of the evidence. *Id.* ¶ 59.

¶ 168    After analyzing provisions of the Act and appellate court case law, our supreme court held:

> "Ultimately, we conclude that the plain language of the Act
> requires the circuit court to determine whether a petitioner has
> shown by a preponderance of the evidence that (1) torture occurred
> and (2) resulted in a confession that was (3) used to obtain a
> conviction, not to assess the voluntariness of statements or other
> constitutional claims that can be raised in a postconviction petition.

To the extent a court answers these questions in the affirmative, the Act provides the court with wide-ranging authority to craft an appropriate remedy to root out and ameliorate the effects of the tortured confession. We thus overrule *Wilson*, 2019 IL App (1st) 181486, ¶ 52, which adopted a contrary standard." *Id.* ¶ 79.

¶ 169     Elsewhere in *Fair*, our supreme court instructed that in applying this inquiry, the circuit court is to consider the totality of the circumstances and the Act's remedial purpose:

"A court analyzing whether a petitioner has shown torture occurred by a preponderance of the evidence must consider the totality of the circumstances, including any alleged violations that would not necessarily qualify as torture if viewed alone. We emphasize that police treatment of a petitioner must be sufficiently extreme to qualify as torture under the Act, but this threshold can be satisfied by a combination of different kinds of acts and omissions— including alleged mental as well as physical abuse—that cumulatively constitutes torture. When engaging in this inquiry, courts should be mindful of the history of police torture in Chicago that led to the legislature's creation of the Act and its remedial purposes to identify victims and ameliorate the effects of those practices by 'establish[ing] an extraordinary procedure to investigate and determine factual claims of torture.' 775 ILCS 40/10 (West 2018)." *Id.* ¶ 88.

¶ 170        In addition, our supreme court in *Fair* clarified that "the manifestly erroneous" standard of review applies to the circuit court's findings as to whether a petitioner has met his or her burden. *Id.* ¶ 80. *Fair* explained:

> "This court will find a circuit court's decision is manifestly erroneous where it contains an error that is 'clearly evident, plain, and indisputable.' (Internal quotation marks omitted.) *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). This standard of review is based on the understanding that the postconviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a position of advantage in a search for the truth which is infinitely superior to that of a tribunal where the sole guide is the printed record." (Internal quotations marks omitted.) *Id.*

¶ 171        Applying *Fair*'s principles to our review of the trial court's decision in the instant matter, we find that the trial court identified the proper overall inquiry. However, as explained below, its findings were manifestly erroneous.

¶ 172                    B. The Trial Court Identified the Correct Legal Standard

¶ 173        Defendant's primary argument (in briefing submitted prior to *Fair*) was that the trial court applied the wrong legal standard in denying him relief. Defendant claimed the court engaged in a "personal, subjective" evaluation of the evidence, when it should have assessed whether the new evidence would be likely to change the result at a new trial or suppression hearing.

¶ 174        As discussed, *Fair* has since clarified the specific inquiry to be determined at an evidentiary hearing upon a TIRC referral. The trial court's lengthy decision indicates that it ultimately identified the correct determinative inquiry—whether defendant proved that he was tortured

into making statements used to obtain his convictions. See *id.* ¶ 79. We note the posthearing decision was internally inconsistent as to the governing inquiries that the court needed to resolve. In the "Legal Standard" portion of the decision, the court stated that the defendant was *not* required to prove that his statements resulted from coercion in order to obtain relief. Indeed, the trial court cited *Wilson* and stated: "If the petitioner satisfies his initial burden of showing that new evidence would likely have resulted in the suppression of his confession, the burden shifts to the State of proving the statement voluntary." That principle was overruled by *Fair*.

¶ 175    Nevertheless, the remainder of the decision shows that the trial court did not attempt to decide whether defendant's new evidence would likely result in suppression. Instead, the court focused on whether it believed defendant's allegations of torture. In its "Conclusions of Law," the court stated its role was "to decide whether petitioner has proved that his confession was the result of torture." In the following paragraph, the court reiterated: "The issue for determination at a hearing convened pursuant to 775 ILCS 40 is *whether petitioner has met his burden of proving by a preponderance of evidence that his confession was a result of physical coercion or torture.*" (Emphasis added.) Elsewhere, the court repeatedly indicated that it was defendant's burden to prove that he was tortured. This was legally correct pursuant to *Fair*, 2024 IL 128373, ¶ 79.

¶ 176    We thus determine that the court identified the proper inquiry at the evidentiary hearing. Our analysis cannot end there, though. We must additionally assess whether the trial court's decision at the conclusion of the hearing was manifestly erroneous, *i.e.*, whether it contains an error that is clearly evident, plain and indisputable. *Id.* ¶ 80.

¶ 177    Here, we find there was such error. In doing so, we keep in mind the supreme court's instruction that "courts applying the Act should weigh the totality of the circumstances on a

case-by-case basis" and that the inquiry should be conducted "in light of the remedial purpose and relevant history behind the Act." *Id.* ¶ 87. Indeed, *Fair* instructs us to be "mindful of the history of police torture in Chicago that led to the legislature's creation of the Act and its remedial purposes." *Id.* ¶ 88.

¶ 178     Applying the standard of review in *Fair*, the record shows clear errors, including the court's complete disregard of the voluminous pattern and practice evidence. Further, the trial court's unwavering acceptance of the State's evidence and wholesale rejection of defendant's evidence shows that the trial court failed to view the evidence through the lens of the "remedial purpose and relevant history behind the Act." *Id.* ¶ 87. In sum, the trial court's decision was manifestly erroneous.

¶ 179     C. The Trial Court Erred in Finding All Pattern and Practice Evidence Irrelevant

¶ 180     The trial court's failure to consider any pattern and practice evidence contributes to our conclusion that its decision was manifestly erroneous. The trial court disregarded all such evidence as irrelevant, including Ivan Smith's and Reeves's hearing testimony and the voluminous documentary exhibits. We agree with defendant that the court abused its discretion in disregarding this evidence, which was certainly relevant to show a pattern of abuse and coercion by the accused detectives.

¶ 181     "It is within the discretion of the circuit court to decide whether evidence is relevant and admissible, and a reviewing court will not disturb the circuit court's decision absent a clear abuse of that discretion." *Peach v. McGovern*, 2019 IL 123156, ¶ 25. An abuse of discretion occurs "where no reasonable person would take the position adopted by the circuit court." *Id.*

¶ 182     "Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without

- 40 -

the evidence." *People v. Patterson*, 192 Ill. 2d 93, 115 (2000). In assessing whether prior allegations of police abuse are relevant to a postconviction claim of coercion, *Patterson* instructs that "relevancy is a determination to be made by the trial court after a consideration of, *inter alia*, the defendant's allegations of torture and their similarity to the prior allegations." *Id.* at 144-45. Prior allegations of police abuse may be relevant when they involve the same officers, involve similar methods of torture, and occur near the time of the current allegations. *Id.* at 115 (citing *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993)).

¶ 183     Our supreme court recently described the inquiry as follows:

> "[S]imilarity is a critical factor to consider when determining whether new evidence of police misconduct in other cases establishes a pattern and practice of certain behavior. However, the test is not one of exact or perfect identity. Rather, the critical inquiry is simply whether there is sufficient similarity between the misconduct at issue in the present case and the misconduct shown in other cases, such that it may fairly be said the officers were acting in conformity with a pattern and practice of behavior." *People v. Jackson*, 2021 IL 124818, ¶ 34 (citing *Patterson*, 192 Ill. 2d at 144-45).

¶ 184     Recent decisions by this court illustrate that prior incidents of abuse have greater relevance where the manner of alleged abuse is similar. See *People v. Plummer*, 2021 IL App (1st) 200299, ¶ 109 (reversing second-stage dismissal of successive postconviction petition where new evidence showed "pattern of systemic abuse by Detectives Kill and Boudreau," where the cited prior incidents were relevant "not only because the abuse was similar *** but they were

also perpetrated by some of the same officers from the same police stations and were incredibly close in time to one another"); see also *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 190 (defendant made substantial showing of constitutional violation where "the type of abuse in many of the cases cited by defendant is similar to the type of beating that defendant claimed he received from the detectives").

¶ 185    Here, the trial court's posthearing decision cited various reasons for finding that none of the pattern and practice evidence was relevant. Yet, the decision contained virtually no discussion of whether the numerous prior allegations were factually similar to defendant's alleged abuse.[11] The trial court apparently conflated the question of whether prior allegations were *relevant* with whether it found they were *credible*, disregarding much of the pattern and practice evidence based on its credibility determinations. Likewise, the trial court disregarded any complaints that were not sustained by OPS. The court also found defendant "waived" any reliance on pattern and practice allegations that the officers were not specifically asked about at the evidentiary hearing. These rulings constituted an abuse of discretion.

¶ 186         D. The Court's Flawed Analysis of Ivan Smith's and Reeves's Testimony

¶ 187    The court's flawed approach is exemplified by its discussion of Ivan Smith's pattern and practice testimony. There can be no doubt that Ivan Smith's testimony was relevant, as he described two of the same detectives harming him in nearly the exact same manner that defendant alleged. Ivan Smith testified that, in November 1991 (only a few months after defendant's arrest), Stehlik and O'Brien took turns holding a phonebook on him and striking

---

[11]The court did state that the "settlement or resolution or disposition of the Anthony Jakes case" was irrelevant because "Jakes was a minor and alleges action taken by officer dissimilar to the case at bar." Yet at no other point did the court discuss whether there was similarity between any of the prior allegations of abuse and defendant's allegations.

the book with a stick. Clearly, this testimony was similar enough to be relevant under the standard in *Jackson*, 2021 IL 124818, ¶ 34. Yet, the trial court simply did not believe Ivan Smith, stating: "Contrary to Ivan Smith's testimony, Ivan Smith was not physically abused by either Detective O'Brien or Detective Stehlik." Thus, rather than assess the *relevance* of Ivan Smith's testimony, the court made a *factual finding* that Ivan Smith's claim was incredible. This was improper.

¶ 188     We have similar concerns with the trial court's stated reason for disregarding Martin Reeves's testimony. The court emphasized that Reeves did not testify that Kill physically abused him, but only that Kill stood by while other officers abused Reeves. The court then indicated that it found Reeves's testimony irrelevant because it did not believe *defendant's* testimony that Kill abused him:

> "Martin Reeves is not a pattern and practice witness for petitioner because Reeves did not accuse Michael Kill of physically abusing him in any way. To the extent that he testified that Michael Kill stood by while he was abused by other police officers, *there is no credible testimony that Michael Kill was present when George Anderson claims he was abused.*" (Emphasis added.)

Thus, the court apparently found Reeves's testimony irrelevant simply because the court disbelieved defendant.[12]

---

[12]We recognize the possibility that this sentence in the trial court's decision meant to refer to Reeves instead of "George Anderson," *i.e.*, that the court concluded there was no credible testimony that Kill was present when *Reeves* claims he was abused. Yet that line of reasoning would also be flawed because it would reflect that the court decided Reeves was not credible instead of assessing whether his allegations were similar enough to be relevant as pattern and practice evidence.

¶ 189    Although Reeves did not accuse Kill of actually beating him, that did not render Reeves's testimony irrelevant; it was enough that Kill participated in coercing Reeves. See *People v. Harris*, 2021 IL App (1st) 182172, ¶ 50 (in deciding whether pattern and practice evidence would have affected the outcome of the suppression hearing, the court considers "whether any of the officers who interrogated defendant may have participated in systemic interrogation abuse" (citing *Patterson*, 192 Ill. 2d at 144-45)). Indeed, evidence of an officer's "silent acceptance" of torture committed by other officers is still relevant. *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 103 ("even if the new evidence established only that Pienta stood by and did nothing while other officers committed acts of torture and abuse, silent acceptance is still relevant to the issue of whether Pienta's credibility may have been impeached as a result of this evidence"). Here, Reeves testified that Kill worked with other officers who threatened him and physically coerced his false confession. Indeed, Reeves testified that Kill handed him a statement and told him that if he signed it, he could eat and go home. This is not dissimilar from defendant's testimony that Kill pressured him into signing a false statement. Reeves's testimony was clearly relevant to showing Kill's pattern of participation in systematic abuse. The court abused its discretion in declining to find either Ivan Smith's or Reeves's testimony relevant.

¶ 190                E. The Court Erred in Disregarding Claims That Were Not Sustained by OPS

¶ 191    The trial court also abused its discretion when it relied on OPS determinations to disregard certain complaints of abuse as irrelevant. The trial court noted that numerous complaints were deemed unfounded or "not sustained" by OPS. These included complaints against O'Brien by Samhan Ali, Glen Dixon, Maurice Lane, Luis Martinez, David Torrentt Jr., and Gregory Logan; Bobby Spencer's complaint against Kill; Andre Altman and Eric Jackson's complaint

against O'Brien and Stehlik; Emmett White's complaint against O'Brien and Halloran; and Marcus and Joseph Jackson's complaint against Halloran and Boudreau. The trial court similarly noted that the Independent Police Review Authority (IPRA) did not sustain Stanley Gardner's complaint that O'Brien, Halloran, and other officers beat Gardner and left him in a cold room.

¶ 192     Whether a prior allegation was deemed unfounded by OPS does not indicate whether it has "sufficient similarity" to defendant's alleged abuse, which is the pertinent relevance inquiry. *Jackson*, 2021 IL 124818, ¶ 34 (citing *Patterson*, 192 Ill. 2d at 144-45). We are aware of no authority that allows the trial court to deem prior allegations irrelevant on this basis. In fact, our court has relied on such pattern and practice evidence. See *Tyler*, 2015 IL App (1st) 123470 (finding defendant was entitled to third-stage evidentiary hearing on claim of coerced confession under Post-Conviction Hearing Act). The *Tyler* decision summarized many prior claims of abuse, noting that three of those claimants' cases (those of Eric Johnson, Sandy Curtis, and Emmett Smith) were closed by OPS. See *id.* ¶¶ 67, 70-71. Nevertheless, *Tyler* subsequently referred to those three claimants in discussing the evidence of systemic abuse that, if presented at trial, could have reasonably undermined the detectives' credibility. *Id.* ¶¶ 170, 172-73, 186.

¶ 193     We also find persuasive a recent unpublished decision regarding an evidentiary hearing on a claim under the Act alleging abuse by Boudreau, Halloran, and O'Brien. *People v. Smith*, 2022 IL App (1st) 201256-U. Similar to this case, the *Smith* defendant submitted numerous exhibits relating to allegations of abuse by the same officers. *Id.* ¶ 79. The trial court found the evidence unpersuasive because, *inter alia*, "many of the claims included in defendant's evidence resulted in losing efforts for those claimants, or were simply civil complaints that had

(at least as of yet) not resulted in a finding of abuse by Boudreau, Halloran, or O'Brien." *Id.* ¶ 83.

¶ 194 This court in *Smith* held that the trial court "improperly weighed" such evidence:

> "Generally, the court discounted much of defendant's evidence because none of the defendants in cases presented achieved a specific finding from a court on the merits that they were abused by the subject detectives. However, neither the circuit court nor the State has cited to any authority that a previous judicial determination of torture is required. We reject the existence of such a requirement, as it does not appear in the language of the Act and would make it exceedingly difficult for a defendant to obtain relief. This result would be impossible to square with the Act's extraordinary remedial purposes." *Id.* ¶ 98.

Similarly, we see no reason why the relevance of a prior allegation depends on any OPS determination.

¶ 195 Although the State insists the trial court properly considered whether OPS sustained prior allegations of abuse, it does not cite any Act decisions in support. The State refers us to *People v. Porter-Boens*, 2013 IL App (1st) 111074, which affirmed a ruling that quashed a defendant's subpoena for prior complaints against the arresting officer. The State points out *Porter-Boens*'s statement: "The trial court may properly exclude evidence of prior allegations of misconduct involving different officers if the prior allegation is factually dissimilar to the officer's conduct in the pending case, *and if the officer did not receive discipline from his department.*" (Emphasis added.) *Id.* ¶ 17. The State also refers to the decision's statement that allegations of

misconduct, "without evidence the officer was disciplined, are not admissible as impeachment." *Id.* ¶ 20. However, *Porter-Boens* is not a TIRC action and did not involve any claim of a coerced confession. In any event, that decision makes clear that the primary inquiry in deciding the relevance of prior allegations is whether they are "factually dissimilar to the officer's conduct in the pending case." *Id.* ¶ 17. Clearly, the similarity of past allegations of police misconduct does not depend on whether the officer was ever disciplined.

¶ 196    In short, the pertinent relevance inquiry is one of similarity, which did not depend on how OPS handled a prior complaint. Thus, the court erred insofar as it deemed pattern and practice evidence irrelevant based on OPS's treatment of past claims of police coercion.

¶ 197    F. The Trial Court Erred in Crediting Police Officer Denials to Determine That Prior Claims of Abuse Were Irrelevant

¶ 198    For similar reasons, the trial court also erred to the extent it found prior claims of abuse irrelevant because it believed the officers' evidentiary hearing testimony denying the prior instances of abuse. The court's decision reflects that it consistently made credibility determinations to find that the alleged abuse did not happen, in the course of finding the claimant's allegations irrelevant. Among other examples, the trial court

(1) found "O'Brien did not abuse" either Tyrone Reyna or Oscar Gomez, citing O'Brien's denials in this proceeding;

(2) found a "lack of evidence" or "insufficient evidence" that Boudreau abused Jerry Gillespie, Peter Williams, Harold Hill, or Joseph Jackson, citing Boudreau's denials;

(3) found "John Halloran never physically abused Clayborn Smith," citing Halloran's testimony in this hearing; and

(4) found "insufficient evidence that Detective James O'Brien kicked" Glen Dixon, citing O'Brien's denial that he kicked Dixon.[13]

In this manner, the trial court simply credited the officers' testimony at this hearing whenever an officer denied one of the allegations of abuse.

¶ 199      This was improper, at least insofar as the court made credibility findings to determine the threshold question of whether the new evidence was relevant. We again note that the issue of relevance turns on whether the prior allegations of abuse were similar in nature, regardless of whether their veracity was disputed by the officers' testimony. It is hardly surprising that the officers consistently denied abusing any of the pattern and practice claimants, just as they denied abusing defendant. Yet such denials do not impact whether the other claims of abuse were relevant, *i.e.*, "whether there is sufficient similarity between the misconduct at issue in the present case and the misconduct shown in other cases." *Jackson*, 2021 IL 124818, ¶ 34.

¶ 200      Moreover, although we recognize the trial court had a position of advantage in assessing the truth because it could observe and hear the witnesses at the evidentiary hearing (*Fair*, 2024 128373, ¶ 80), we nevertheless find that the trial court's credibility determinations are manifestly erroneous. The trial court's decision reflects that it simply accepted the denials of all accused officers of any allegations of torture or other wrongdoing, notwithstanding the voluminous pattern and practice evidence. Although this court is aware of the high level of deference paid to the circuit court's factual findings under the "manifestly erroneous" standard identified in *Fair*, that does not mean we must abandon *any* review of the trial court's credibility findings. To do so would reduce our function to rubber-stamping the factual

---

[13]O'Brien acknowledged in his testimony that he "fought with" Dixon.

findings below. Here, given the ample pattern and practice evidence, we are troubled that the trial court simply accepted *all* denials by *all* accused officers, especially given the ample evidence of separate instances of torture by those officers.

¶ 201          G. Pattern and Practice Evidence Was Not "Waived" Merely Because Officers Were

Not Asked About Specific Allegations

¶ 202     We also agree with defendant that the trial court erred when it found that defendant "waived" reliance on prior allegations of abuse as pattern and practice evidence, if defendant's counsel did not specifically ask the officer about the specific allegations at the evidentiary hearing. For example, the court found that, because defendant's counsel "did not question Detective James O'Brien about any allegations of coercion made by Dan Young," "any attempt to use Young's testimony as pattern and practice with respect to O'Brien has been waived."

¶ 203     The State's brief contends that the failure to ask an officer about a past allegation of abuse is a "perfectly valid" reason to find such evidence irrelevant, yet it does not cite any precedent for this point. Although we are not aware of a decision directly addressing this question, we agree with defendant. The relevance of evidence of prior alleged incidents of abuse depends on their similarity to defendant's allegations. That inquiry is not contingent on whether the officers were specifically asked about such prior claims at the evidentiary hearing. In any event, it is hard to imagine a scenario in which an officer asked about such past allegations would admit to the prior abuse. That is, just as the trial court could not disregard evidence of prior abuses merely because the officers denied it, such evidence could not be disregarded merely because officers were not asked about it at the evidentiary hearing. The trial court's ruling that defendant "waived" such evidence was an abuse of discretion.

¶ 204          H. The Trial Court Erred in Disregarding Any Prior Allegations Against Halloran

¶ 205      We also agree with the defendant that the trial court erred when it indicated it would disregard any pattern and practice evidence against Halloran, on the ground that defendant's original motion to suppress did not identify Halloran as one of the officers who abused him.

¶ 206      We acknowledge that the motion to suppress did not name Halloran. However, it alleged that an unnamed officer, together with Kill, struck defendant in the course of coercing his confession in the Miggins case. Significantly, there is no dispute that Halloran was, in fact, working with Kill to interrogate defendant on the date in question. At the hearing on the motion to suppress, Kill testified that he and Halloran interviewed defendant. And at the post-TIRC referral evidentiary hearing, Halloran acknowledged that he handcuffed defendant to a ring on a wall before interviewing him with Kill.

¶ 207      Although defendant apparently did not know or recall Halloran's name when the motion to suppress was drafted and argued in the early 1990s, that is hardly surprising. See *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 121 (recognizing that "maybe [defendant] was never sure, to begin with, exactly who threw which punch, slap, or kick in what order. It does not strike us [as] implausible that someone experiencing a stressful encounter would struggle to keep those kinds of facts straight, not immediately afterward and certainly not decades later"). Moreover, defendant has consistently alleged for decades that an officer working with Kill struck him in the course of interrogating him about the Miggins shooting. And it has now been established that Halloran helped interrogate defendant on the night in question.[14] The court

[14]Moreover, we note there are now many documented complaints of Halloran abusing detainees within the same time period. See *Smith*, 2022 IL App (1st) 201256-U, ¶ 99 (noting the "sheer number of allegations" against Halloran, Boudreau, and O'Brien, including that "at least eight defendants were later exonerated, acquitted, awarded a certificate of innocence, or had their charges dropped even though some combination of Boudreau, Halloran, or O'Brien allegedly extracted a confession from them using torture").

abused its discretion in disregarding past claims against Halloran merely because he was not explicitly named in the initial motion to suppress. The prior claims against Halloran were clearly relevant and supported defendant's allegations.

¶ 208    I. The Trial Court Erred in Disregarding Any Prior Allegations Against Boudreau Based on Defendant's Motion to Suppress Testimony

¶ 209    We similarly agree with defendant that the court erred in disregarding any evidence of past abuse allegations against Boudreau. The court indicated its belief that such evidence was irrelevant because defendant testified at the 1994 motion to suppress hearing that Boudreau did not hit him. Again, it would not be surprising if defendant did not have a clear understanding at that time as to which officer committed each specific act. See *id.* In any event, defendant accused Boudreau of striking him in his TIRC affidavit and his subsequent evidentiary hearing testimony.[15] And there is no factual dispute that Boudreau was working with Kill and Halloran on August 21, 1992. Simply put, defendant's TIRC claim accused Boudreau of working with Kill and Halloran to coerce defendant's confession. In turn, prior allegations that Boudreau participated in similar coercion are relevant to show a pattern of such conduct. See *Tyler*, 2015 IL App (1st) 123470, ¶ 181 ("Since the vast majority of the cases presented by defendant involve allegations of police misconduct by two or more detectives, it is crucial to consider the claims of a systemic pattern of abuse in the context of several officers working together to obtain a false confession in the case at bar."); see also *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 68 (in assessing pattern and practice evidence, "the questions are

---

[15]Even if Boudreau did not actually strike defendant but merely acquiesced while other officers abused him, evidence regarding Boudreau's prior conduct would still be relevant. As previously mentioned, even an officer's "silent acceptance" of torture committed by other officers is still relevant. *Whirl*, 2015 IL App (1st) 111483, ¶ 103.

(1) whether any of the officers who interrogated petitioner may have participated in systematic and methodical interrogation abuse and (2) whether those officers' credibility at petitioner's suppression hearing or at trial might have been impeached as a result"). Accordingly, the court erred in disregarding the ample pattern and practice evidence implicating Boudreau.

¶ 210    In sum, the various reasons given by the trial court to disregard pattern and practice evidence were improper. Accordingly, the court abused its discretion when it found there was no relevant pattern and practice evidence.

¶ 211    We have thus concluded that the circuit court erred in disregarding the pattern and practice evidence. That evidence should have factored into its ultimate assessment of whether defendant showed that torture resulted in his confessions and convictions. See *Fair*, 2024 IL 128373, ¶ 79.

¶ 212                    J. The Trial Court's Decision Was Manifestly Erroneous

¶ 213    We have now determined that the trial court abused its discretion in rejecting the pattern and practice evidence as irrelevant and that relief was not otherwise barred by the defendant's guilty plea in the Miles case or his prior testimony in the Miggins case. We now turn to the propriety of the trial court's findings in the course of denying defendant relief. Specifically, the trial court found defendant failed to show that he was tortured, disregarding all of the pattern and practice evidence and finding defendant lacked credibility.

¶ 214    We again recognize that the deferential "manifestly erroneous" standard of review applies. *Fair*, 2024 IL 128373, ¶ 80. A decision is manifestly erroneous where it contains an error that is clearly evident, plain, and indisputable. *Id.* We also reiterate *Fair*'s instruction that courts applying the Act "should weigh the totality of the circumstances" "in light of the remedial purpose and relevant history behind the Act." *Id.* ¶ 87.

¶ 215  The extensive record in this case showed a pattern of police torture by the detectives who interrogated defendant combined with defendant's longstanding consistent allegations that police torture (over the course of 30 hours) led to his inculpatory statements. Nevertheless, the trial court decided not to consider *any* of defendant's evidence and found him to be untruthful, all while accepting the officers' denials of misconduct. Accordingly, we conclude the trial court's finding that defendant failed to meet his burden was manifestly erroneous.

¶ 216  Defendant presented ample relevant pattern and practice evidence, including numerous prior complaints against the detectives he now accuses of abusing him to coerce his statements in the Miles and Miggins cases. This is certainly true with respect to his claim that O'Brien and Stehlik coerced the Miggins statement. As the TIRC recognized, O'Brien has been subject to approximately 50 claims of coercion, many of which were documented in defendant's submissions to the trial court. Among those claims is that of Ivan Smith, who testified at the evidentiary hearing that O'Brien and Stehlik struck him with a phonebook in a virtually identical manner to what defendant has consistently alleged since his motion to suppress. Clearly, this evidence significantly undermined O'Brien and Stehlik's testimony denying their mistreatment of defendant while interrogating him about the Miggins case. Yet, the court wholly discounted that important pattern and practice evidence.

¶ 217  The same is true with respect to the ample pattern and practice evidence offered regarding the detectives who allegedly coerced defendant's statement about the Miles shooting: Kill, Boudreau, and Halloran. As the TIRC's decision noted, Kill has been named in about 40 complaints of coercion, Halloran in more than 50, and Boudreau "is notorious for having obtained confessions in cases where the individual was in jail at the time of the offense to which he confessed, cases which were later undermined by DNA evidence, and more than a

dozen cases where charges were dropped or the individual was acquitted at trial." Many of those prior complaints are described in the pattern and practice evidence, including claims by Harold Hill, Dan Young, Nick Escamilla, Tyrone Reyna, Peter Williams, Clayborn Smith, and Oscar Gomez that they were abused by Halloran and Boudreau.[16] The pattern and practice evidence also shows several other individuals alleged abuse by Boudreau, either individually or in concert with Kill, including Imari Clemons, Jesse Clemons, Damoni Clemons, Johnny Plummer, and Anthony Jakes, whose conviction was vacated in 2018. See Sarah Schulte, *Two Men Wrongly Imprisoned as Teens Have Convictions Vacated*, ABC 7 Chicago (Apr. 30, 2018), https://abc7chicago.com/wrongly-convicted-convictions-vacated-murder-conviction-chicago-exoneration/3410907/ [https://perma.cc/RTH7-TD49]. And Reeves testified at the evidentiary hearing how Kill pressured him to sign a false confession in a similar manner that defendant alleged with respect to the Miles statement.

¶ 218   We note that evidence regarding several of the same claimants was also relied upon by Clayborn Smith in connection with his TIRC claim alleging abuse by Boudreau, Halloran, and O'Brien. See *Smith*, 2022 IL App (1st) 201256-U, ¶ 79. In that case, this court remanded for a new suppression hearing after finding that Smith "produced sufficient evidence of a pattern [of] physical abuse by the detectives in question," observing it would be "difficult to imag[ine] a scenario in which the detectives' testimony is not viewed in a new light given the numerous torture allegations made by other defendants, which was not available at the time of the original

---

[16]Codefendants Hill and Young were ultimately exonerated by DNA testing. See Rob Warden, *Harold Hill*, The Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3296#:~:text=Harold%20Hill%20and%20his%20co,found%20had%20been%20set%20ablaze (last visited June 20, 2024) [https://perma.cc/G8RH-9MY2]; see also *Tyler*, 2015 IL App (1st) 123470, ¶ 65 (recognizing "Hill was exonerated through DNA evidence" and was released from prison).

suppression hearing." *Id.* ¶¶ 99, 102. Similarly, the voluminous evidence implicating the detectives who interrogated defendant strongly corroborated his claims of torture.

¶ 219     We proceed to find that, under the governing inquiry and standard of review set forth in *Fair*, the trial court's factual findings against defendant and its decision to deny relief were manifestly erroneous. See *id.* ¶¶ 79-80. The trial court consistently made findings of fact in the State's favor and against defendant, with little explanation. It credited substantially all of the State's proffered testimony at the hearing, including whenever the accused detectives denied that they mistreated defendant or the numerous other pattern and practice claimants. The court also emphasized that it found defendant untruthful, concluding he had fabricated his allegations and testimony to "rid[e] on the [*sic*] Burge's torture bus."

¶ 220     Notwithstanding the deferential standard of review, under the totality of the record, we find the trial court's credibility determinations were against the manifest weight of the evidence.[17] The evidence shows that, as the TIRC decision noted, defendant's core allegations of abuse and coercion relating to both the Miles and Miggins cases have remained consistent for nearly 30 years. Specifically, he has consistently alleged that (1) Kill kicked his handcuffs, (2) Kill's partner struck him, (3) O'Brien and Stehlik handcuffed his hands above his head, (4) O'Brien struck him in the side with an object cushioned by a book, and (5) he was placed in a cold air-conditioned room. And while the detectives have consistently denied the abuse and maintained that defendant confessed voluntarily to the crimes during his 30 hours in custody, their

---

[17]We note that although the trial court had the ability to observe testifying witnesses first-hand, much of the evidence in this case consisted of documents detailing the extensive pattern and practice of abusive tactics by detectives who interrogated defendant. Unlike live testimony, our appellate court can certainly evaluate that documentary evidence just as accurately as the trial court. The trial court's decision to ignore that evidence weighs heavily against affirming its decision, regardless of its ability to observe the demeanor of live witnesses.

credibility is substantially (if not completely) undermined by the plethora of similar allegations against them from the same time period. As discussed, defendant submitted voluminous evidence establishing that the accused officers engaged in a pattern and practice of coercing confessions using techniques similar to, if not identical to, what defendant has consistently alleged. Under the totality of the record, we conclude it was manifestly erroneous for the trial court *not* to find that defendant had proved that police torture resulted in the confessions that led to his two underlying convictions.

¶ 221 Before we discuss the appropriate remedy, we briefly address the State's arguments that defendant was independently barred from relief due to (1) his plea in the Miles case or (2) his prior testimony in connection with the Miggins case. Neither contention has merit.

¶ 222 K. Defendant's Plea in the Miles Case Did Not Waive Relief Under the Act

¶ 223 In its brief, the State contended that defendant's guilty plea in the Miles case "waived" his claim for postconviction relief under the Act, citing case law holding that a voluntary guilty plea waives all nonjurisdictional errors. See, *e.g.*, *People v. Anderson*, 375 Ill. App. 3d 121, 133 (2006) (finding waiver of police coercion claim in successive postconviction petition); *People v. Peeples*, 155 Ill. 2d 422, 491 (1993) (guilty plea underlying prior convictions barred defendant from challenging the State's use of his confession to those prior crimes as aggravating evidence at his sentencing hearing).

¶ 224 At oral argument, however, the State conceded that this argument is unavailing in light of our decision in *People v. Johnson*, 2022 IL App (1st) 201371, in which we held that Jerome Johnson's plea in the Miles case did not waive his claim under the Act. We emphasized that waiver of a statutory right must be " 'voluntary, knowing, and intelligent' " and with a " 'full awareness of both the nature of the right being abandoned and the consequences of the decision

to abandon it.' " *Id.* ¶ 89 (quoting *People v. Lesley*, 2018 IL 122100, ¶¶ 50-51). We reasoned that Johnson "could not possibly have had a 'full awareness' that he was abandoning any right under the [Act when he pleaded guilty in 1992, for the simple reason that the [Act] was not yet enacted at that time." *Id.* Our decision in *Johnson* applies here with equal force. As the Act was not yet in effect at the time of defendant's plea in the Miles case, that plea "could not have constituted 'an intentional relinquishment or abandonment of a known right' to seek relief under the [Act]." *Id.* ¶ 99 (quoting *Lesley*, 2018 IL 122100, ¶ 36).

¶ 225                   L. Defendant's Prior Testimony Was Not a "Judicial Admission"

¶ 226       We next address the State's contention that defendant made "judicial admissions" in prior testimony concerning the Miggins case that preclude him from obtaining relief. The State avers there are two such instances. First, the State emphasizes defendant's cross-examination in the Miggins case, in which he gave the following one-word responses to the State's questions:

> "Q. Now, let me ask you at the end of that statement *** you
>
> told the state's attorney in there you had been treated well by the
>
> police and the assistant state's attorney, right?
>
> A. Yes.
>
> Q. That was true, right?
>
> A. Yes.
>
> Q. You also stated that you weren't made any promises in
>
> return for the statement nor you weren't threatened in any way.
>
> You told that to the state's attorney?
>
> A. Yes.
>
> Q. That was true, right?

A. Yes.

Q. You told the state's attorney you were offered both food and water and they were, brought food from McDonald's, right?

A. Yes.

Q. That was true?

A. Some of it.

Q. Some of it.

A. Yes.

Q. You told the state's attorney that you were free from the effects of drugs and alcohol, that was true?

A. Yes.

Q. So you weren't treated badly by the police?

A. No."

¶ 227    The State posits that defendant's responses constituted a "clear and unequivocal judicial admission" that he was "treated well by the police." The State suggests that, in light of this testimony, defendant cannot now claim that he was mistreated.

¶ 228    Separately, the State argues that defendant's testimony at the 1994 motion to suppress hearing was a "clear and unequivocal admission that Detective Boudreau never hit him." The State refers to the following exchange:

"Q. Now, the other detective that testified here, Detective Boudreau, Detective [Kill's] partner, you testified that he also kicked you and slapped you with his hands on your face?

A. No, ma'am.

Q. He never hit you?

A. No, ma'am."

¶ 229    The State refers us to a number of civil, non-Act cases concerning judicial admissions, primarily *In re Estate of Rennick*, 181 Ill. 2d 395 (1998). *Rennick* explains that "[o]rdinary evidentiary admissions may be contradicted or explained" but these "should be distinguished from judicial admissions, which conclusively bind a party." *Id.* at 406. Our supreme court proceeded to explain: "Judicial admissions are defined as deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge. [Citation.] Where made, a judicial admission may not be contradicted in a motion for summary judgment [citation] or at trial [citation]." *Id.* at 406-07.

¶ 230    This court has also cautioned that "[t]he doctrine of judicial admissions requires thoughtful study for its application so that justice not be done on the strength of a chance statement made by a nervous party." (Internal quotation marks omitted.) *North Shore Community Bank & Trust Co. v. Sheffield Wellington LLC*, 2014 IL App (1st) 123784, ¶ 115. Because the doctrine is not intended to penalize "confusion or an honest mistake," a judicial admission will be found only if "the party making the statement had no reasonable possibility of being mistaken." (Internal quotation marks omitted.) *Id.* ¶ 126.

¶ 231    We are not persuaded by the State's reliance on the judicial admission doctrine. Significantly, the State cites no precedent suggesting that prior testimony from a *criminal* proceeding has ever been construed as a binding judicial admission. Thus, there is no support for the suggestion that defendant's prior testimony could ever qualify as a judicial admission. Further, the State does not cite any case finding that a judicial admission can operate to bar a claim for relief under the Act. This is not surprising, since the Act "establishes an *extraordinary*

*procedure* to investigate and determine factual claims of torture." (Emphasis added.) 775 ILCS 40/10 (West 2018).

¶ 232    Moreover, even assuming that the concept of judicial admissions could apply, we would not be convinced that the two cited portions of defendant's testimony would qualify. First, we cannot say defendant's one-word answers to the State's line of cross-examination at the Miggins trial were unequivocal statements that defendant was treated well by police. This is especially so, given defendant's explanation at the evidentiary hearing that he was surprised by this line of cross-examination, since he and his trial counsel had decided not to discuss his abuse by police. Defendant's explanation was consistent with the testimony of his former trial counsel, Judge O'Hara, who acknowledged that he told defendant they would "not go into" his allegations of police abuse at trial.

¶ 233    With respect to defendant's testimony at the 1994 motion to suppress that Boudreau did not hit him, we emphasize that a judicial admission should not be found if it could be the product of mistake or confusion. *North Shore Community Bank & Trust Co.*, 2014 IL App (1st) 123784, ¶ 126. Given the circumstances of the 1991 interrogation (which lasted 30 hours and involved numerous officers), there is a reasonable likelihood that the cited testimony regarding Boudreau was the product of understandable confusion or mistake on defendant's part. See *Gibson*, 2018 IL App (1st) 162177, ¶ 121 (explaining it would not be surprising if a coerced defendant was "never sure, to begin with, exactly who threw which punch, slap, or kick in what order"). We thus reject the State's contention that the prior testimony operated as a binding judicial admission.

¶ 234    M. The Proper Remedy Is Remand for New Trials

¶ 235    We turn to the appropriate remedy, keeping in mind that the Act "provides the court with wide-ranging authority to craft an appropriate remedy to root out and ameliorate the effects of [a] tortured confession." *Fair*, 2024 IL 128373, ¶ 79. We conclude that defendant is entitled to suppression of his statements at new trials, rather than merely remand for a new suppression hearing.

¶ 236    Judicial economy is served by this outcome. As the parties recognized at oral argument, the trial court's evidentiary hearing after the TIRC referral functioned as a second motion to suppress hearing. The trial court, as well as this court, has now had the opportunity to consider all evidence relevant to defendant's claim that his inculpatory statements were involuntary. Remanding for a third suppression hearing (at which the very same evidence would be presented) would be a waste of judicial resources.

¶ 237    We also note that defendant's claim under the Act has been pending for over a decade, and it has been over 30 years since the alleged police coercion. Thus, it is in the interest of justice to remand for new trials without the inculpatory statements, rather than to prolong proceedings with a duplicative suppression hearing.

¶ 238    We acknowledge that our decision to remand for new trials may be painful for the families of the young victims in the underlying cases, especially as it has now been more than three decades since the 1991 murders. We are sympathetic to the fact that they had no control over whether police officers abused defendant or the length of time it has taken for the TIRC claim to be litigated. However, we are bound to apply the Act and our caselaw to guard against use of a confession obtained through torture, regardless of whether a defendant is guilty. See *People v. Wrice*, 2012 IL 111860, ¶ 71 (recognizing that use of a physically coerced confession as substantive evidence of guilt "is never harmless error").

¶ 239    At this point, we acknowledge that our prior opinion *sua sponte* directed that a different trial judge preside over defendant's subsequent trials. As directed by our supreme court's November 2025 supervisory order, we have reconsidered that decision in light of *People v. Class*, 2025 IL 129695. We recognize, as defendant notes, that Judge Hooks has retired and that any future proceedings will be before a different judge. Defendant therefore argues the issue is moot and that we should not apply *Class* to this record. But we are not free to do so. The supreme court's supervisory order—entered more than a year after Judge Hooks's retirement—expressly directs us to reconsider this portion of our prior opinion in light of *Class*. Our task on remand is defined by that instruction. See *People v. Grant*, 2014 IL App (1st) 100174-B, ¶ 39 ("[O]ur review of a case as a result of a supervisory order is limited by any instructions issued by our supreme court pursuant to the order."). *Class* clarified that in postconviction proceedings, an appellate court cannot *sua sponte* "order reassignment to a new circuit judge for reasons other than bias, potential bias, or prejudice on the part of the prior circuit court judge." *Id.* ¶ 1.

¶ 240    In *Class*, the appellate court reversed the dismissal of a postconviction petition and remanded for a third stage evidentiary hearing; in doing so, the appellate court ordered assignment to a different trial judge. See *id.* ¶ 17. After the State filed a petition for leave to appeal, the appellate court issued a modified opinion that "rejected the State's claim that the only valid basis for reassignment on remand in a criminal case is a finding of bias or actual prejudice on the part of the trial judge." *Id.* ¶ 21. Our supreme court allowed the State's petition for leave to appeal.

¶ 241    Our supreme court found that, generally, a reviewing court has authority under Illinois Supreme Court Rule 615(b)(2) (eff. Jan. 1, 1967) "to modify subsequent proceedings by

directing a new judge upon remand." *Class*, 2025 IL 129695, ¶ 31. The court then addressed "under what circumstances may an appellate court *sua sponte* order that a new judge be assigned upon remand of the case" in postconviction proceedings. *Id.* ¶ 32. Our supreme court clarified that an appellate court "may *sua sponte* order judicial reassignment in subsequent postconviction proceedings in rare circumstances. [Citations.] An appellate court may do so only when the record on appeal clearly reveals bias, the probability of bias, or prejudice on the part of the trial judge." *Id.* ¶ 37.

¶ 242     Our supreme court reiterated that judicial bias requires more than adverse rulings or opinions. *Class* approvingly recited the following guidance from the United States Supreme Court:

> " 'First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. [Citation.] In and of themselves, *** they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required when no extrajudicial source is involved. *** Second, opinions formed by the trial judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do

so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' " *Id.* ¶ 38 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

¶ 243   Elsewhere, *Class* confirmed that "only under the most extreme cases would disqualification on the basis of bias or prejudice be appropriate by an appellate court *sua sponte* on appeal in a postconviction proceeding." *Id.* ¶ 45. *Class* thus held that that "In the absence of a record showing bias, the probability of bias, or prejudice on the part of the judge" in a postconviction proceeding, our appellate court may not *sua sponte* order reassignment of the case to a different judge on remand. *Id.* ¶ 52.

¶ 244   Applying *Class* to the instant situation, we cannot say that the record in this case shows the requisite bias, probability of bias, or prejudice to warrant *sua sponte* reassignment to a new trial judge on remand. We recognize the trial judge's post-hearing findings were uniformly in favor of the State and against defendant. Yet it is well-established that bias requires more than merely adverse findings. See *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002) ("Allegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant.").

¶ 245   The trial court also made some remarks that disparaged defendant and his motivation for filing the underlying petition. In characterizing defendant as a "Ghost rider" on the Burge "torture bus," the court essentially accused defendant of fraudulently claiming torture to take advantage of relief intended for legitimate TIRC claimants. However, *Class* makes clear that opinions expressed by a judge will not constitute bias or partiality "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." (Internal

quotation marks omitted.) *Id.* ¶ 38. Even judicial remarks "that are critical or disapproving of, or even hostile to" a party "ordinarily do not support a bias or partiality challenge." (Internal quotation marks omitted.) *Id.*

¶ 246        Although some of the trial court's remarks were highly critical and disapproving of defendant, the record is insufficient for us to say the court's opinions "derive[d] from an extrajudicial source" or that the court displayed such a "high degree of favoritism or antagonism as to make fair judgment impossible." See *id.* ¶ 44. Thus, under *Class*, we cannot say that this case presents the rare circumstances necessary for this court to *sua sponte* direct assignment to a new trial judge on remand. See *id.* ¶ 45 ("only under the most extreme cases would disqualification on the basis of bias or prejudice be appropriate by an appellate court *sua sponte* on appeal in a postconviction proceeding").

¶ 247                    N. Denial of State's Motion Taken With the Case

¶ 248        We now address the State's motion that was taken with the case. Following the entry of the supreme court's supervisory order directing us to vacate our March 2023 judgment and reconsider this matter in light of *Fair*, the State moved to vacate our April 2023 order releasing defendant on his own recognizance. That is, the State sought to send defendant back to prison pending our reconsideration of this case. The State argued that defendant no longer had a presumption of innocence after the supervisory order directed us to vacate our prior judgment. The State otherwise urged that, under *Fair*, this court was bound to change the result and affirm the trial court's denial of relief under the Act.

¶ 249        We have concluded that, after applying *Fair* to the record in this case pursuant to the supervisory order, the proper result remains the same. We again find that defendant is entitled to vacatur of his convictions and remand for new trials without the inculpatory statements. The

presumption of innocence applies to him pending the new trials. We thus deny the State's motion seeking to vacate our order releasing defendant on his own recognizance.

¶ 250                            III. CONCLUSION

¶ 251        For the reasons stated, we reverse the judgment of the circuit court, vacate defendant's convictions in both the Miggins case (No. 91 CR 22460) and the Miles case (No. 91 CR 22152), and remand for new trials in those cases. The State shall be precluded from using the defendant's written inculpatory statements in either trial.

¶ 252        Reversed and remanded with directions.

¶ 253        JUSTICE LAVIN, dissenting:

¶ 254        In light of *Fair*, which requires a defendant to prove he was tortured and permits the trial court to make credibility findings, I would affirm the trial court's judgment. I would also grant the State's motion to vacate our prior order releasing defendant on his own recognizance.

*People v. Anderson*, 2026 IL App (1st) 200462-C

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 91-CR-22152, 91-CR-22460; the Hon. William H. Hooks, Judge, presiding. |
| **Attorneys for Appellant:** | David B. Owens and Fadya Salem, of The Exoneration Project at the University of Chicago Law School, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Robert Milan, Special State's Attorney, Of Chicago (Alan J. Spellberg, Assistant Special State's Attorney, of counsel), for the People. |
| *Amicus Curiae*: | Michael A. Scodro, Elaine Liu, Clare Myers, and Sara Norval, of Mayer Brown LLP, of Chicago, for *amicus curiae* Persons Concerned About the Illinois Criminal Justice System. |